project in our appeal. At the outset I want to thank the court for changing the briefing for the argument schedule in this case to accommodate the party's request. In my 15 minutes I would like to address three points and answer any questions that you may have. Could you keep your voice up? Yes sir. First, the Secretaries of the Interior and Agriculture adopted the aquatic conservation strategy, including the standard MM1 that is at issue in this appeal, to deliberately change the status quo. They intended that activities such as mining and livestock grazing and logging would proceed under the Northwest Forest Plan, but would proceed under new and different standards that would provide safeguards for protecting and restoring wild salmon. Standard MM1 is such a safeguard and as you're aware it provides, in pertinent part, that mineral operations in specially designated areas called riparian reserves must be proceeded by an approved plan of operations. I want to emphasize that when the Northwest Forest Plan was promulgated in 1994, a number of groups brought suit in the Western District of Washington to challenge its efficacy, and among other things the Department of Justice defended the aquatic conservation strategy as a new and improved management regime for these traditional activities, and said in its briefs that the aquatic conservation strategy will provide significant protection for wild salmon because it provides for all riparian areas to be within reserves in which standards and activities. In this appeal, no party has asserted that the language of standard MM1 is ambiguous, nor that the Forest Service, if it has authority or had authority to adopt the standard, that it doesn't apply to the suction dredge operations that we challenge in this case. As a result, the Forest Service violated the standard unless this court concludes and agrees with the agency that the standard is somehow contrary to the agency's general mining regulations. Our position is that it is not contrary to those regulations simply because it is different. Neither the National Forest Management Act nor the Northwest Forest Plan. Well, it requires an activity. It requires the miners to do something that they're not required to do under 228. That's not entirely true, Your Honor, with respect. Well, I mean, out the door, out the gate, it requires them to submit a plan if they're in riparian reserves. That's correct. Under the regulation, if this standard did not exist, what the miners would be required to do to commence these kinds of operations is submit to the agency what is called a notice of intent to them. Right. An NOI. An NOI. And the agency would then look at it, as it has done in this case, and turn around and say, you may go mine. Right. The only difference is that in 1994, the secretaries decided that they were going to have a different kind of regime and not have district rangers making the discretionary call. Rather, they qualified these very special areas, riparian reserves, and said, if you're going to mine in them, you must simply propose to the agency a plan of operations. And what that does under the regulations is it goes to the agency, and the agency then is required to prepare an analysis under the National Environmental Policy Act. It requires the miners to post a bond and whatnot. It does that as well, you're right. And a commitment to repair any harm that they've done. A commitment with financial ramifications if they don't do it. And the record in this case, the DEI... Let me ask you this. Okay, so when they adopted the Northwest Forest Plan and the standards and guidelines in MM1, there's no question but that 228 existed. So you're right. I mean, they knew about 228 in the general regulation. But nonetheless, for riparian reserves, they came up with this regime. Now, later on, I don't know, maybe the light went off or something. I don't know what happened. They said, ah, seems to be a conflict here. And we need to fix it. So here's what we're going to do. They end up reading it. I mean, there's a whole history here about the litigation and whatnot. The aborted efforts to do an ERI and whatnot. But we are, we end up where we're at today. Why don't they have, you know, the discretion to do that? And why aren't we required, or not required, but why aren't they entitled to some deference in how they interpret and apply their own regulations? They have the discretion, Your Honor. Well, they don't have the discretion whether or not to implement an unambiguous standard such as this one. But when they did, you know, although they did know about 228. Well, that would... I mean, you got to assume that they were quite aware of it. But they provided in the standards and guidelines that, you know, they were not, that these SMGs would apply so long as they weren't inconsistent with or contrary to a regulation, whatever that language was. And so later on, you know, they say, ah, you know, there's a conflict here. Or there's contrary to, or it's inconsistent with, or requiring more than should be required. So we're going to fix that. Why can't they do that? Because that would render the adoption of the standard in the first place when the agencies were well aware, they were well aware of the mining regulations in its regime. And what they intended to do was change things. Well, they did change things for operations that had, or likely to have, some substantial effect on the surface. I'm sorry, Your Honor. I mean, it doesn't render that, the standard, meaningless. It does... The regulatory standard? It does apply whenever there is a likelihood of a substantial effect on the surface. That's correct. But the problem with the extant situation where the only thing that a district ranger is doing upon receipt of a notice of intent is looking at a singular operation on a singular creek and saying, it doesn't seem to me that this is meaningful. Well, but that doesn't have anything to do with whether the standard conflicts with, that's just a squawk about how the particular forest ranger is treating particular applications. Right? Right. Okay. With this exception, Your Honor, if MM1 were faithfully implemented, this agency would be preparing environmental assessments of the propriety of that and looking at the cumulative impacts of it in combination... Which would squarely conflict with 228. With respect, Your Honor, it wouldn't... It can't, you can't have it both ways. I mean, you cannot have a per se rule. You've got to have a plan of operation together with all the panoply of paperwork that goes with it for all mining operations. And on the other hand, have a rule which allows for the exercise of discretion on the part of the forest ranger with respect of whether there's a likelihood of a substantial harm to the surface. I mean, the two can't co-exist. From that singular operation. I mean, that's the decision that the secretaries of the Interior and Agriculture made when they adopted the standard. In other words, to find otherwise would render the adoption of this standard, the careful language the secretaries chose and defended in court superfluous. Sure, but at the same time that they adopted that carefully worded standard, they adopted a carefully worded asterisk that said, however, if anything we've said in these guidelines and standards conflicts with existing law or regulation, the regulation wins. Correct, if this court were to agree with the agency's interpretation of what contrary to means, and it's our position that contrary to does not mean merely different. I mean, these two systems can co-exist. What I was just trying to explore with you a minute ago is it seems to me that it's more than being merely different. That the two can't, your view is the standard is a per se, all the time, no exceptions rule for all minerals operations. 228 says substantial or likelihood of substantial injury to the surface. And it's discretionary, so per se versus discretionary. They just are almost night and day, aren't they? Your Honor, this case is not about all mineral operations that gold panning or whatever might else occur on the Siskiyou National Forest. It is about only those operations that the Forest Service itself determined in 2001 warranted an environmental impact statement to analyze their cumulative impacts because they do have a cumulative impact on the wild salmon that exists on this forest. And the context, I think, of their impacts is very important for this court's consideration. These are not healthy runs of fish. Wild coho salmon, as you are aware, are threatened with extinction. Steelhead are at appreciable risk of extinction. And it was exactly that biological status of these fish runs that led the secretaries in 1994 to adopt this standard. It is different. It does withdraw from the district ranger the discretionary call whether to require a miner to submit a plan of operations. I concede that. I think the agency was in preparing the environmental impact statement that we supported that would have had programmatic terms and conditions for all these operations and, under its view, allow it to approve them as they came in with certain special safeguards that would account for where the mining is occurring, what kind of disturbance is happening. Those safeguards don't exist today because the answer to an NOI by the agency since 2002 has been uniformly, go mine. You may mine. And that's it. The only restrictions are those that the state has imposed through its Clean Water Act permit. And those restrictions, as the EIS explains, aren't entirely sufficient because it's a state general permit for all waterways in the state of Oregon. It's not one that's specific to the specific life salmon that exists on the system. If I may, on the question of ambiguity and forest plan standards, this court, a unanimous panel in an opinion authored by Judge Graber recently called Lands Council v. Martin, I think struggled with an analogous question where there was a forest plan standard that was unambiguous on its face. And the Forest Service argued, you know, this is too onerous and too burdensome for us, and you must defer to our interpretation of this standard. And Judge Graber's answer was, no. I mean, the standard is clear. You have the prerogative to change it through a public process if you think it's too burdensome or too onerous. The proper role for us as a court is simply to require you to implement this unambiguous standard. And I think that case is analogous to the situation before this court. I have two minutes remaining. Yes, you do. Would you like to say all right to request rebuttal, or would that be difficult given the number of attorneys here? I think you can do that. All right. Unless the court has further questions for me. Thank you. Thank you, Mr. Frost. May it please the court, my name is James Buechel, and I represent the Waldo Mining District and Mr. Barton. This is a case of immense importance to the miners, which is why we have a lot of them here and filling up the room back there, because this is a life or death sentence for their way of being in this case. And I'd like to reserve about five minutes for rebuttal. The first point I'd like to emphasize is that, apart from some remarks in a draft document, there is no real evidence of environmental harm whatsoever. There is no evidence that so much as a single baby fish has ever died. There's a lot of talk, this is one of the vices about programmatic challenges, but the site-specific evidence, the evidence relating to my client's claim, it's above an impassable waterfall. There's no endangered salmon there. There's no steelhead. Nothing inadvertent can even get there. And as for the harm that might occur, the only harm that these people have ever caused in the past is they suck around in the bottom of the stream and they might hit a nest of fish eggs. And so years ago, the state passed in-water work times to say you can't go in there when the eggs are there, you can't go in there until the fish are gone. These people caused no harm whatsoever. There's also a comprehensive Clean Water Act scheme of regulation, which is in the record, which deals with the water and protection of the water. And what we have here is a set of statutes addressing surface renewable resources that have gradually expanded in this fashion that has created an awful mess. The Forest Service is on record saying there's no environmental benefit from adding another layer of environmental regulation. There's no cumulative impacts. During the course of this process, the Service commissioned a study. They could compare streams where mining occurred and where it never occurred. They couldn't find any evidence of any impact. Streams that were heavily mined, not mined at all, there is nothing there at all. Now, the second point I'd like to emphasize is that there's a vast array of pertinent statutes that are relevant here. And the only court that's ever been presented with them all and considered them all didn't reach the ultimate conclusion, the Krupp case. But the Supreme Court, they haven't considered them all either. We start with the 1872 Mining Act. The public land shall be open to mining. We go to the 1897 Organic Act. The Forest Service can regulate surface uses, but they can't stop people from entering and developing mining. We get to the 1955 Multiple Use Act. The surface resource management cannot materially interfere with mining. All of these statutes are important. None of them are discussed in these forest plans at all. The forest planners go off and they cite a bunch of statutes and they ignore them all. That's what I put in the supplemental excerpts of record. Now, around this time was the rise of planning in this context. And I'd like to just digress for a minute. What is planning? Planning presupposes that we have someone who says, I know what the best use of that land is. Mining is completely different. Mining is, we've got to go out and find the minerals. And we can't mine if they're not there. So you cannot specify in advance and say, oh, we think this is a good area for mining and this isn't and so forth and so on. You can withdraw areas from mining. You can say, I want to protect these areas and reserve them. Over a quarter of the forest is reserved and there's a specific federal statute passed at the same time as the National Forest Management Act, the FPLMA, which provides procedures for doing that. That is how you close areas to mining, not through standards and guidelines. Now we come to the next act, the 1960 Multiple-Use Sustained Yield Act. And it starts down the road of the renewable resource planning and it says, we have a principle here that what we're doing here shall not affect the use or administration of the mineral resources, period, at all. This renewable resource planning is about renewable resource. Mining is a different universe. We come to the statute finally at issue here. They're all still on the books. They all apply. They're all in PARI materia. They all have to be considered and some reasonable accommodation has to be reached. We come to the National Forest Management Act. Five, six, seven places in this act. It says, you're going to develop this program consistent with the principles of the Multiple-Use Sustained Yield Act. The plan has to be consistent. The regulations have to be consistent. And there is not a word about mining in there at all. Now, it's true that at some time in the past, planning regulations came out that started talking about mining. Those regulations are gone. It is remarkable that Mr. Frost is citing an 1982 version of those regulations. The Forest Service is citing a year 2000 version of those regulations. We are the party that has presented the current planning regulations to the court and the current planning regulations recognize, wait a minute, these mineral operations are not properly the scope of forest plans. So if you are going to defer to the Forest Service, you should defer to their formal APA notice and comment rulemaking concerning the statute, not a Justice Department attorney who shows up and starts citing these regulations that are now obsolete. Now, there's one provision of the National Forest Management Act that they say might somehow apply and that is 1604I, which says, permits, contracts, other instruments for the use and occupancy of the forest shall be revised to be consistent with the plans. I would argue nobody ever thought this had anything to do with mining at all. There are thousands of pages of legislative history, and I was surprised to find that there is one place somewhere where the word mining appears. That is the only place it appears. It is inconsistent with all the history of statutes. It's inconsistent with the design of the statutes. It's inconsistent with the existence of this entire parallel regime of regulation. It's just, it's an isolated instance that doesn't control the statutory language. Against all this, the Forest Service shows up and says, well, we have the discretion to use the procedural vehicle of the forest plan to establish these guidelines to govern mineral operations. As Your Honor has noticed, if you're governing the operations and telling them what to do, and it's not just you have to apply for this or put in a plan, it's a bond. We hear in Mr. Frost's brief that these people have these little gallon gas containers, so we need all this spill equipment and all the revegetation and so forth and so on. All these substantive requirements, it's not about procedure at all. And there's another whole set of law that compels the conclusion that forest plans are not how you govern people, and that is the Federal Register Act. These things are not published in the Federal Register, yet they cannot be applied against citizens unless they are. That's set forth in the Federal Register Act, that's set forth in the Administrative Procedure Act, and instead we have planners who write things, and they don't even make a lot of sense. Mr. Frost says, no one contests that the plain language and standard applies. Well, I do. It's in my brief. Riparian means of or pertaining to the land adjacent to a stream. It doesn't mean the stream, and so if you go into a record here, you'll see that in the Siskiyou Forest Plan, riparian reserves are land. In the 1994 Record of Decision, riparian reserves are land. You go back to the standard of guidelines. On one page, they're land. And then in the back, in a place that Mr. Frost identifies, it says, well, they include the stream. These things are not clear. These things are not to guide the Forest Service's actions in context to having nothing to do with mining, and it was a mistake to import all this mining stuff in there. Now, let me turn to the issue of why should you reach this question. You should reach this question because Munch's is suggesting that you don't really have to decide this. The question is about granting effective relief. Now, there's two scenarios for the Court to consider. First, perish the thought. Suppose that the Court decides that M.M.1 and M.M. regulations are consistent. We can enforce them both. Then there's clearly a live issue here because it's clear under Supreme Court precedent that we have standing to contest the application of some rule if it's enacted on the basis of the wrong statute, if the you have to set it aside, and so then consistent becomes irrelevant, and it's a live question. Now, the Service comes in and says, well, it doesn't matter because we just do it again under the Organic Act. The Court sits to evaluate what's here not. Now, it can't interfere with agency discretion by presupposing that the Forest Service will just go out and do it again, and of course, if they do it again, they'll challenge it again because we don't believe that the Organic Act can materially interfere with these things in that way in a context where there isn't any environmental harm at all. Now, I'll concede that if you agree with the Forest Service and say there is no conflict, you're not going to apply it. It's a closer case for mootness. In that context, I'd refer, Your Honors, to the Friends of the Earth case that was recently decided by the Supreme Court. It has to be absolutely clear that this problem won't occur again, and yet here, we have every reason to believe it will. The plan is still there. The guidelines are still there. The Forest Service, on one hand, says it has the discretion to say they conflict. Other Forest Service officials say it doesn't. Consider the sequence of events here. My client applies, gives the notice of intent, appeals this thing all the way up the administrative ladder, loses, a year later brings suit. Finally, sometime into the litigation, I don't know when, all of a sudden, the problem here, we're not actually out to get you. You don't have to file it. Let me ask you a question on that. If the court were to hold that the regulation trumps, that's the result you want, but it would be on a rationale that you don't, that doesn't go as far as you would like. Have I kind of captured it correctly? In other words, your preferred option would be to say, look, the Forest Service lacks authority to regulate mining through a forest plan. That's correct, Your Honor. All right. But it's not what I prefer. Well, I understand. That's what you want. That's the relief that you would like. Right. We ask for a declaratory judgment to that effect because of 10 years of controversy. Right. Okay. If the court were to hold that 228A trumps MM1, you have got your result. Not if it's based on discretion, because then we have a new election, a new administration, and now discretion changes again. The record is right. Well, I understand, but you've got a court. I understand your conundrum, and I think it presents a really, very tricky question. That's why you've made the Frenzner case. But look, if you get the result of regulation not through the standard, that's going to be a court decision binding on everybody within this jurisdiction. Now, that doesn't keep the Forest Service from trying to modify the standard or this time and day on these papers, 228 trumps. Right. Why does that leave anything other than just gratuitous advice? Indeed, because this time and day, it trumps. But under Frenzner, it has to be absolutely clear, and those are the court's words, that this won't ever happen. No, I'm not talking about the Forest Service's change of position. I'm talking about something that's slightly different. I'm talking about a court order that says 228 trumps. That ends the controversy with respect to the effect of MM1 on your type of mining. Why is there still a live controversy that would make anything else that we say with respect to MM1 unadvisory? This goes to the core of judicial review of agency action. If your Honor says that it is so clear as a matter of law that we win, and this is not about deferring to agency discretion at all, that's fine. If your Honor says we're going to defer to the agency's interpretation, then no law has been established because I have established a record that says that the agency's discretion will blow like the flag in the wind here. And so we have not achieved a secure remedy that makes it absolutely clear this won't happen again. And since I only have two minutes left, perhaps I should sit down. Thank you. May it please the Court. Good morning, Your Honors. My name is David Young. I represent Gerald Hobbs. Mr. Hobbs is here today. I represent Gerald Hobbs before this Court because in the District Court, for a unique series of events, Mr. Hobbs became the only defendant in the United States District Courts that wasn't allowed to defend himself. We had a situation where Mr. Hobbs was in the remedial phase of the litigation. Then the plaintiffs, SREP, filed an amended complaint. And in that amended complaint, they took dead aim at Mr. Hobbs, and they asked for affirmative relief directly against Mr. Hobbs, as long with a number of other defendants. Nowhere in that complaint, either in the or in any of their various causes of action where it could be done that it says this is asserted against Mr. Hobbs only for the remedial phase of the litigation. Nothing like that. It is a broad-based complaint. It asks for relief against him. If the Court were to say that 228 trumps, then is there anything left for Hobbs to defend? Yes, there really is. Why? Because this type of situation can happen again and again and again. Well, yeah, but wait a minute. Wait a minute. Judgment was entered. So if this Court were to agree, then what's left for, there's no, there's nothing left to the action, is there? Well, there'd be nothing left in the action, but there would be a, there would be a situation where this type of situation, where a defendant is allowed to intervene in a very limited phase, and this is what the problem is, but an amended complaint can be asserted against him in a broad-based assault. Not if this case is over. Excuse me? Not if this case is over. Not if this case is over, but if it, but he didn't, he, he, are you now trying to argue the intervention aspect? Are you trying to say that his affirmative defenses and his claims of his? I'm sorry, Your Honor. Are you trying to say that his affirmative, he wasn't allowed to defend himself, is what you said? Right, right. And I'm saying that, there's nothing to defend if, if, if the judgment stands. Well, if the, if the judgment stands for this particular case, Your Honor, that may be correct. However, the situation, the situation that this could arise again and again and again is very present. So what does that provide? Excuse me? What is it that you say is still out there? What piece of paper is out there? Is it a quest to intervene? Well, Mr. Hobbs is the President of Public Lands for the People. Yeah. Mr. Hobbs has intervened in cases previously. We have other cases with Mr. Bupre. I'm just trying to find out what you're arguing. Are you arguing that the district court goofed on the intervention now? No. I'm arguing that the district court, to use Your Honor's phrase, goofed in not allowing Mr. Hobbs to fully defend himself, to fully assert, to fully assert counterclaims, to fully assert affirmative defenses, that he had a right to do that because the, the amended complaint totally supersedes the district court's right to do that. Did you go back to the district court after the amended complaint was filed and ask the district court to allow you to fully intervene and all as a party defendant? No, because the district court made it clear that what they, they really wished to do was have a separate complaint filed and consolidate. Well, did you do that? No, we did not do that. Why didn't you do that? Because Your, because Your Honor, that did not seem feasible at the stage that the litigation was in, and secondly, Your Honor, because we did not feel that we should, that we should have to do that. We felt that we had the right to do it at this stage right now and assert all of our defenses that we had, both affirmative defenses and also counterclaims, that we had that right because it was a totally new complaint. After the, after Mr. Hobbs is allowed to intervene at the remedy phase. Right. Did the district court instruct the plaintiff to file a new complaint? The, the district court did not instruct the plaintiff to file a new complaint. This was totally voluntary on the part of the plaintiffs. And did the plaintiffs ask for approval to file an amended complaint? That, that is an excellent question. They did not ask for approval to file an amended complaint. They did, that I know of, they did, they certainly did not ask for approval to file an amended complaint against Mr. Hobbs. So, who was allowed to intervene only for the remedial stage. Maybe they should have done that, but they did not do that. Well, technically he, he amended when he intervened even at the, was allowed to intervene even at the remedial phase. He was, I gather he was intervening on this, well, maybe not. Maybe he was just a separate intervening defendant. He, he comes in basically almost at the remedial phase as a friend of the court almost. The court says he may have some advice to the court as to what it is the small minors as a practical matter actually face, and the court may be willing to look at that advice. That's what he really is in here for. I see that I'm approaching the end of my time. If there are any other questions for the Court, I would be, I only have about 50 seconds left, so if there are any other questions for the Court. Actually, you're in a deficit position. I'm sorry? You're actually in a deficit position. You're 50, you're one minute over time, so thank you for your argument. Thank you very much, Your Honor, I appreciate the credit. Thank you, Mr. Young. Are we now, you, Mr. McFadden? I may please the Court. My name is Lane McFadden, and I represent the United States Department of Agriculture Forest Service. The Part 228 regulations at issue here today were promulgated under the Forest Services Authority under the Organic Administration Act, and help balance the protection of environmental harm to surface resources with the statutory right of the miners to enter the public lands for mineral development. My argument today will have two components. The first is jurisdictional, and the second discusses the reasonableness of the Forest Services interpretation of its own standard and guidelines, as well as its own regulations, interpretations to which this Court has repeatedly deferred to the agency. First, I want to mention something which no one has yet brought up, which is the failure of the plaintiffs in either the complaint or the amended complaint to actually judicially reviewable under the Administrative Procedure Act. They specifically mention, I forget what paragraph it is, Mr. Hobbs and, let's see if I can find it. Anyway, there's a specific reference to not requiring them to file a plan of operation. There's a specific reference to the 30, I think it is, letters in response to the original complaint with the Court in the attempt to put together some sort of administrative record in response to the original complaint. And then the amended complaint says, at least 30 times the Forest Service has refused to order a plan of operations. We identify, you know, interveners at the Bartons and the Walden Mining District and Mr. Hobbs. But you don't have a specific challenge to the decision made by the district ranger not to require a plan of operations for those two notices of intent for specific reasons, which then this Court might have an administrative record on. And then all of the discussion in the briefs from both Shrepp and from the miners about whether suction dredge mining is or is not environmentally harmful might have some relevance to this Court's ruling. We simply don't have the record we need on those particular mining operations to make any sort of a ruling on it. Well, in paragraph 24 of the amended complaint, they specifically allege, with respect to Mr. Barton and Mr. Hobbs, the allegation that says those mining operations occurred without an approved plan or plans of operations and without a reclamation plan or bond where required. Why isn't that? I mean, that's right. They're going right to those specific operations. That language is there. But the summary judgment motion, the arguments presented to that Court and to this Court are all programmatic. I mean, they are not, none of them mention the specifics of either of those mining operations. Well, the whole focus is on whether there's any kind of conflict between MM1 and 228. Sure, sure. But of course, that's what the case is all about. That's right. Because if they win, then Barton and Mr. Hobbs have to submit a plan of operation. Well, that's right. But it's important to establish the bedrock principle that you only challenge those. They're not challenging the decision based solely on 228. Right. They're just challenging the application of MM1. But they have to challenge that application. It simply just hasn't arisen in that context. I don't know the way I read the complaint. They seem to, at least with respect to Mr. Barton and Mr. Hobbs, maybe if they hadn't had that paragraph 24 in there, then your argument might really have some force to it. Well, I just wanted to stand on that principle. I will then move on to the mootness argument. So let me tell you, well, go ahead. If you're going to address the mootness, that's fine. If you have more questions about that, go ahead. No, I'm interested in the court, what I think is the core issue, which is plaintiffs just described MM1 as being different than 228. It's different in the way that- Judge Reimer laid out a whole scenario about how there is a conflict. And Judge Reimer is correct. The difference between the guideline, MM1, and the regulations is that when the district ranger receives a notice of intent, under this interpretation of MM1, the district ranger must as a per se matter require a plan of operations. Under the regulations, the district ranger cannot do that unless the operation in question meets a specific set of criteria. It's going to use earth-moving equipment or is found in the district ranger's discretionary determination to likely cause a significant disturbance of surface resources. So on the one hand, he has to make a determination before he can require a plan of operations. On the other hand, he has no opportunity and must require them. And that's not different. So explain to me, what was the thinking behind MM1? I mean, obviously at the time MM1 was adopted, they were- the officials were well aware of 228. I think it's fair to assume that. Certainly the regulations were in existence. The administrative record doesn't discuss anywhere what the idea was when the MM1 was drafted and promulgated. Well, there's a whole discussion in the forest plan and the preparation of the Northwest Forest Plan about how they wanted to protect the aquatic surfaces. Yes, as general principles. Right. And they focused in. They used MM1 to zero in on the riparian reserves. That's right. But there's also the equally weighty provision that that only applies when it's not contrary to regulation. And what we do have to guide- So I'm still trying to understand, you know, it's difficult to be honest with you. Somebody thought, you know, I have to- I just- I don't want to believe that they didn't recognize that 228 existed. But maybe they didn't. I don't know. And they adopt this MM1, a standard that seems to require a per se- adopt a per se rule. Now they didn't seem to think at that time that there was any conflict. Very shortly after the NFP- What happened? What's the, you know, the light went off. We don't know what the internal thought processes were. But that shouldn't actually guide the Court's sort of reasonableness of determination. The question is the explanation. No, but it helps me understand why they see that there is no conflict or why they, you know, why they now see that there is a conflict. I'm sorry. Well, only a couple of months after the NFP was promulgated was that 1995 directive from the National- Forest Service National Office, which says there's a conflict here. I mean, you can't apply MM1 in situations where the regulations would not require a plan of operations. You can't use this standard and guideline to require a plan of operations. So admittedly, there's- I mean, I understand the cognitive dissonance of the promulgation of MM1 in the face of the 228 regulations, but almost very immediately thereafter you have a national directive from the agency which says, look, this is the way we will address this conflict. This is the way we're interpreting both the regulation and the guideline. If you read their directive in 1995, it makes absolutely no sense. It makes no sense. Well, it's written poorly. I will concede that. But it is attempting to make the exact same sort of interpretive claim that the 2002 directive is. The 2002 directive is longer and there is a sort of period of reflection to give the agency that benefit. But that- I mean, the national policy on this has been consistent throughout. I mean, now, what is it, 13 years. These- this guideline and these regulations conflict, and so the regulations trump because that's the way the NFP is written. It says the regulations trump, and so you apply the scheme set up by the regulations, and then the plan of- I mean, and then MM1 is triggered. And I should point out that there's a comment made by Shrupp both in the presentation today and in the reply brief that somehow there's- this renders MM1 a complete nullity, and that's not true. I mean, as Your Honor has pointed out, the standard and guideline requires a reclamation bond, which the regulations do not require. So there you have a different, more protective sort of action in the riparian reserves. The MM1 also lays out very specific considerations for a reclamation plan, which would be required. All of these things would be required, as the agency interprets it, of an operation that triggers the plan of operations requirement of 228.4. So it is a different, more protective mechanism for riparian reserves, as the NFP clearly indicated, but it's also consistent with the regulations because it has to be. It can't be applied contrary to the regulations. That's the nature of the NFP, so that's the agency's position today. It was also the agency's position immediately after the promulgation of the NFP. I'm sorry. I don't have a more entertaining tale to tell. That's okay. I'm not asking you for a more entertaining response, but I understand. I just kind of wanted to hear what you had to say. And that is it. I would like to address what happens if the Court does agree with us that the regulations trump, as Your Honor has put it, and that's the end of it. I mean, the claims about the Forest Service's authority under NFMA to protect surface resources and the extent to which that can affect mining, all of those would be rendered moot at that point. I mean, there's no current requirement that Mr. Barton file a plan of operations. And there's much talk about Friends of the Earth v. Laidlaw, but that's a very different case. It's a citizen suit against a private operation for previous violations of a major environmental statute, and the Court said just because you closed your facility, that's voluntary cessation of illegal activity. And voluntary cessation, as we all know, is not good enough to eliminate the case and get you out of court. But this is not a voluntary cessation instance. I mean, this is, you know, this is in the policy of the agency. The agency did not change its policy in the direct face of the suit by anyone here today. This is simply, I mean, there's no argument being made that it did. So there was a period of time where you were, where the agency was enforcing MM1. That's right. But then in response to the Washington office, it stopped doing that, has continued to stop doing that. And no one has, I mean, of course, the claim will always remain the agency will always change its policy. Is there any insurance that down the line, you know, the Washington office might issue a new directive? Oh, now we're going to follow MM1. Well, nothing more than the presumption of regularity due to the Forest Service's decisions and the fact that if it changed its course and said that we will nationally apply the regulation the way the Siskiyou Forest was briefly applying it, that would be, or sorry, the guideline, that would be contrary to regulation. The NFP doesn't allow that. So you have that assurance as well. That is, this is the way that they need to be interpreted and will be interpreted. I mean, there's nothing to indicate besides the general distrust of federal agencies that there will be a change of position. And of course, the agency is entitled to change its position in the future. That alone does not eliminate a mootness argument. Neither does the risk, as the minors put it, that this Court might order the agency to do something that it is not currently doing and does not currently believe it can do. I mean, that's not the kind of thing a party doesn't come into court and say, well, I currently have no calls of action, but I will in the future if you rule in a way that you might. That simply doesn't answer the mootness response. So I think this Court quite easily resolved this case by agreeing Forest Service's interpretation of both its Forest Plan standard and guideline and its regulations, that it only applies them in situations that the regulations would allow. Unless the Court has any more questions? MS.   MR. FADDEN Thank you very much. MS. GOTTLIEB Mr. Frost. MR. FROST One point of clarification and two quick arguments in my short time for rebuttal. Your Honor, you asked whether the district court ordered the parties to file amended complaints. The answer is yes, it did. It's not in the excerpts of record because I didn't realize that was a contested matter, but I can submit that. MR. GOTTLIEB That's okay. I can look at the document. MR. FROST We were ordered to file amended complaints. MR. GOTTLIEB That's fine. MR. FROST So we did. On two points of arguments, MM1 is not the first standard in the Siskiyou Forest Plan that per se requires plans of operation for mining in specially designated areas. It's the second. The first one is MA710. It requires per se every time an approved plan of operations for mineral operations in what are called supplemental resource areas. Those are far more limited geographically than riparian reserves under the plan. And factually in this case, the agency had never received a notice of intent to mine in an SRA. So when we had brought an action in the district court related to MA710, we asked the district court to drop it because we couldn't factually prove our case. My point is that standard existed even before the Northwest Forest Plan was adopted and included the language related to something being contrary to the regulations. So this agency was well aware that it could, even when the regulations existed, adopt a per se rule. And in fact, in the Siskiyou Forest Plan in 1989, it did that. My second quick point is the question isn't generally do the regulations trump MM1. The question with respect is specifically do they trump under the theory advanced by the Forest Service in its 2002 directive that the terms of MM1 don't apply to suction dredging because it seems like they're too onerous or too cumbersome. And the answer to that is that the DEIS, the agency produced in 2001, included precisely the same terms that MM1 does. These standards do apply to suction dredge plaster mining, standards such as a reclamation plan and recontouring disturbed areas. So under the agency's theory, which must be the focus of this court's inquiry, the agency was wrong in determining that the regulations are contrary to MM1. Thank you. Mr. Frost? Mr. Buford? I'm fascinated by Justice Reyes's questions about why, why, why, because they bring to me the point of why mootness is so important and why the court should follow Friends of the Earth. In the real world, the world I live in, suing the federal government all the time, there a cloud of statutes where there are so many statutes addressing an area, nobody ever really keeps them all in mind, and people do what they want to do, and then people fight about it afterwards. And so here, there's an initial determination, the miners squawk, they go to Washington, they complain, things turn around. There's a whole back history of what goes on that isn't in the record. And what's in the record is this flip-flopping. And so this is on all fours with Friends of the Earth. There's a party who has a plant, it's closed down for violations, it's over, the plant's dead and gone. And the Supreme Court says, wait, these people have invested years of their life in trying to get this principle of law clarified. You know, the public interest cries out to get this thing straightened out. This is an issue of judicial craftsmanship, as it were. And I don't understand why this federal government can get up and say, well, we have a change in policy, and that's not the same as a voluntary cessation. Well, that's what voluntary cessation is. You make a demand of a citizen, and now policy doesn't require it. And maybe after the elections at the end of the year, it will require it. And so that's why I want to make a plea that these things are not moot. They are going on, Mr. Frost stands up and says, oh, this isn't the only one. We have MM1, we have MA7 through 10. This fourth plan will sit there for the foreseeable future, radiating out these standards and guidelines that will continue to fuel conflict. And my minors have spent five years trying to drive a stake through the heart of this beast. And we think the court ought to do it. It's that simple. Thank you.
judges: Rymer, Nelson, Paez